# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE CITY OF PHILADELPHIA, BOARD OF PENSIONS AND RETIREMENT, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> BARCLAYS BANK PLC, CITIGROUP, INC., CITIBANK, N.A., DEUTSCHE BANK AG, HSBC BANK PLC, HSBC BANK USA, N.A., J.P. MORGAN CHASE & CO., J.P. MORGAN CHASE BANK, N.A., ROYAL BANK OF SCOTLAND PLC, and UBS AG, <br><br> Defendants. |  <br><br> Case No. _____ <br><br><br> **CLASS ACTION COMPLAINT** <br><br><br> <u>**JURY TRIAL DEMANDED**</u> |



## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................ 1

JURISDICTION AND VENUE .......................................................................................... 4

THE PARTIES ..................................................................................................................... 5

    A.  Plaintiff .................................................................................................................. 5

    B.  Defendants ............................................................................................................. 6

FACTUAL ALLEGATIONS ............................................................................................. 12

    A.  Foreign Exchange Market Generally .................................................................. 12

    B.  WM/Reuters Rates .............................................................................................. 13

    C.  Market Changes Caused Increased Concentration Among Dealers .................... 14

    D.  Defendants' Dominance Positioned Them to Capitalize on Their Customers'
        Transactions. ....................................................................................................... 17

    E.  Defendants' Traders Sought to Profit Off of Customer Transactions ................ 18

    F.  Defendants Colluded Using Chatrooms and Instant Messaging to Manipulate
        Foreign Exchange Closing Rates ....................................................................... 19

    G.  Defendants Agreed to Share Confidential Information, Jointly Execute Trading
        Strategies, and Manipulate the Closing Rates ................................................... 23

    H.  Economic Analyses Confirm Defendants' Manipulation of the WM/Reuters
        Closing Rates. ..................................................................................................... 28

EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS DUE TO
DEFENDANTS' CONCEALMENT OF THE CONSPIRACY ....................................... 35

CLASS ACTION ALLEGATIONS ................................................................................. 37

CAUSES OF ACTION ..................................................................................................... 40

PRAYER FOR RELIEF ................................................................................................... 41

DEMAND FOR JURY TRIAL ........................................................................................ 43

Plaintiff The City of Philadelphia, Board of Pensions and Retirement ("Plaintiff" or "Philadelphia Board of Pensions"), individually and on behalf of all those similarly situated, as defined below, brings this antitrust class action for treble damages and injunctive relief and alleges as follows:

## NATURE OF THE ACTION

1.      This case concerns an anticompetitive scheme of truly historic proportions.  For at least a decade, foreign exchange traders working at the Defendant financial institutions ("Defendants") brazenly conspired with each other to manipulate foreign exchange rates and to coordinate their trading strategies so Defendants could make grossly inflated profits at the expense of their own customers.

2.      Defendants ripped off their customers by secretly exchanging customer trading information, discussing trading strategies with each other, and executing agreed-upon strategies in a coordinated fashion.  Defendants communicated with each other in person and, particularly within the past several years, by using private, electronic chatrooms and instant messaging services through which they could secretly and easily coordinate their conduct.  Arrogantly believing they would never be caught, Defendants gave their chatrooms colorful – if candid – names, like "The Cartel."

3.      The foreign exchange market is the largest in the financial system and is critical to the effective functioning of U.S. financial markets.  The majority of the daily turnover in the foreign exchange market – roughly $2 trillion – involves spot transactions.  A spot foreign exchange transaction involves the exchange of currencies between two counterparties for immediate delivery.  Large-scale spot transactions are usually handled by banks with those banks acting as counterparties to customer transactions or as brokers to match orders between

customers.  Defendants dominate this market:  in the last two years, Defendants accounted for nearly 70 percent of all foreign exchange transactions.

4.      To minimize risks attendant to transaction execution, certain customers in the foreign exchange market often have dealers execute their transactions at the end of day closing rate in London, sometimes referred to as the "London Fix."  The London Fix is the end-of-day closing rate calculated by WM/Reuters based on the median exchange rate in the thirty seconds (or one minute for less-traded currencies) before and after 4 p.m. in London (hereinafter referred to as the "WM/Reuters Closing Rate").

5.      It has recently come to light that, for years, Defendants actively conspired with each other to manipulate the WM/Reuters Closing Rate for multiple currencies and to coordinate their trading activity around the 4 p.m. closing so they could jointly make inflated, supracompetitive profits at the expense of their clients (*i.e.*, Plaintiff and the Class here). Defendants employed a number of creative schemes to do this.

6.      For example, since Defendants know their customers' orders tied to the WM/Reuters Closing Rate in advance of 4 p.m., Defendants routinely engaged in "front running."  This is where a dealer trades its own positions in advance of its customers' orders to take advantage of the currency price movement that will occur as a result of the customers' transaction.  Normally, such trading would be risky (not to mention illegal) because other market participants may execute trades at the 4 p.m. closing that move the market in the opposite direction.  But to ensure their front running bets paid off, Defendants secretly shared their customers' information *with each other* and *jointly decided* how to execute their clients' orders so as to make their front running virtually risk free.

7.      Defendants also did something they called "banging the close."  Here, after sharing their customers' trading information with each other, Defendants would agree either to break up, or to consolidate, pending orders into a certain number of orders during the rate calculation period.  Because the WM/Reuters Closing Rate is set at the median transaction, Defendants' coordination in this regard would move the WM/Reuters Closing Rate in the direction that the Defendants jointly preferred, again for the sake of their collective interests, and at the expense of their clients.

8.      Defendants also engaged in something called "painting the screen," whereby they would engage in fake transactions with each other during the window in which the WM/Reuters Closing Rate was calculated to manipulate the exchange rate at the expense of their clients.

9.      The details of Defendants' brazen collusion are revealed in the transcripts of the chatrooms they maintained, which are being reviewed by governmental regulators and others investigating Defendants' illegal activity.  Defendants' collusion has been expressly confirmed by traders and investigators interviewed by media sources.  And this collusion is further confirmed by  independent economic analyses, including a preliminary analysis conducted by Plaintiff's economists, which found pricing behavior highly suggestive of the use of the collusive scheme discussed herein.

10.      Defendants' conspiracy inflicted severe financial harm on Plaintiff and the Class. Plaintiff the Philadelphia Board of Pensions is funded by the City of Philadelphia and by employees of the City themselves.  The Philadelphia Board of Pensions entered into hundreds of millions of dollars of foreign exchange spot and forwards transactions with the Defendants during the Class Period that were settled at or with reference to WM/Reuters Closing Rates.  By virtue of their collusive scheme, Defendants padded their own profits, and their personnel took

home huge annual bonuses, by cheating the Philadelphia Board of Pensions out of money that should have gone to fund the pensions of city employees.

11.     Defendants' misconduct also harmed thousands of other Class members – including other pension funds, university endowment funds, hedge funds, insurance companies, corporate treasuries, fiduciary and depository institutions, small banks, and money managers – in much the same way, resulting in potentially billions of dollars in damages.  Indeed, this case is uniquely suitable for class treatment given the fact that Defendants' conduct harmed thousands of entities in the same way and that the damages it caused will be calculable using formulaic approaches.

12.     Defendants' collusive scheme offends the very core of the antitrust laws. Defendants were supposed to be aggressively competing with each other for the business of their customers, not secretly colluding to achieve profits they could not have achieved on their own. Unsurprisingly, in the months since it came to light, Defendants' anticompetitive conduct has attracted the attention of antitrust and other government enforcement agencies in the United States and around the world, which have open investigations into the same practices by many of the same Defendants named in this Complaint.  As the pressure has mounted, many Defendants have confirmed that they are the subject of investigation and are conducting their own internal investigations, in the process dismissing and suspending numerous senior foreign exchange traders.  Yet Defendants have done nothing to remedy the financial harm inflicted on Plaintiff and other Class members over the past decade.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26) and pursuant to 28 U.S.C. §§ 1331 and 1337(a).

14.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because during the Class Period, all the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

15.     This Court has personal jurisdiction over each Defendant, because each Defendant:  transacted business throughout the United States, including in this District; exchanged currency with Class members throughout the United States, including Class members residing or located in this District; had substantial contacts with the United States, including in this District; and/or committed overt acts in furtherance of their illegal scheme and conspiracy in the United States.  In addition, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

16.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

## THE PARTIES

### A.     Plaintiff

17.     The City of Philadelphia is a municipal corporation organized under the laws of the Commonwealth of Pennsylvania and the Philadelphia Home Rule Charter, and is a political subdivision of the Commonwealth of Pennsylvania.  The Board of Pensions and Retirement is an independent board of the City of Philadelphia under the Philadelphia Home Rule Charter.  The Board of Pensions and Retirement is charged with the maintenance of the retirement system for all City employees.  The City of Philadelphia Public Employees Retirement System, which is

maintained by the Board of Pensions and Retirement, is funded by the City of Philadelphia and

employees of the City.  During the Class Period, the City of Philadelphia, Board of Pensions and

Retirement entered into foreign exchange spot and forwards transactions with the Defendants

that were settled at or with reference to WM/Reuters Closing Rates and was injured as a result of

Defendants' anticompetitive conduct.  The City of Philadelphia, Board of Pensions and

Retirement exchanged hundreds of millions of dollars in currency with the Defendants during the

Class Period, referencing the WM/Reuters Closing Rates, and as a result has potentially suffered

millions of dollars in damages.

        **B.**    <u>**Defendants**</u>

18.      Whenever in this Complaint reference is made to any act, deed, or transaction of

any entity, the allegation means that the corporation engaged in the act, deed, or transaction by or

through its officers, directors, agents, employees, or representatives while they were actively

engaged in the management, direction, control, or transaction of the entity's business or affairs.

19.      Defendant Barclays Bank plc is a corporation organized and existing under the

laws of the United Kingdom with its principal place of business in London, England and branch

locations in New York, New York.  As used herein, the term "Barclays" includes Defendant

Barclays Bank plc and its subsidiaries and affiliates that entered into foreign exchange

transactions with the Class.  During the Class Period, Barclays directly entered into spot and

forward foreign exchange transactions with Class members.

20.      Barclays confirmed on September 30, 2013, in its third quarterly Interim

Management Statement that "various regulatory and enforcement authorities have indicated that

they are investigating foreign exchange trading, including possible attempts to manipulate certain

benchmark currency exchange rates," that the "investigations appear to involve multiple market

participants," and that "Barclays Bank has received enquiries from certain of these authorities

related to their particular investigations, is reviewing its foreign exchange trading covering a several year period through August 2013 and is cooperating with the relevant authorities in their investigations."[1]  To date, Barclays has suspended six foreign exchange traders including Chris Ashton, its global head of voice spot trading, Jack Murray, Mark Clark, Russell Katz, and Jerry Urwin.  Barclays has also launched an internal probe into the role of its salespeople in manipulating foreign exchange rates.

21.     Defendant Citigroup, Inc. ("Citigroup") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  Defendant Citibank N.A. ("Citibank") is a federally chartered national banking association with its principal place of business in New York, New York, and is a wholly owned subsidiary of Citigroup.  As used herein, the term "Citi" includes Defendants Citigroup and Citibank and their subsidiaries and affiliates that entered into foreign exchange transactions with the Class.  During the Class Period, Citi directly entered into spot and forward foreign exchange transactions with Class members.

22.     Citi confirmed on November 1, 2013, in its third quarterly Form 10Q Report that "[g]overnment agencies in the U.S. and other jurisdictions are conducting investigations or making inquiries regarding trading on the foreign exchange markets" and that it "has received requests for information and is cooperating with the investigations and inquiries and responding to the requests."[2]  Citi suspended and then terminated its head of European spot trading, Rohan Ramchandani, and has also placed two other traders – Anthony John and Andrew Amantia – on leave.

---

[1]   Barclays PLC, *Interim Management Statement* (Sept. 30, 2013).

[2]   Citigroup Inc., *Third Quarter 2013 – Form 10Q* (Nov. 1, 2013).

23.     Defendant Deutsche Bank AG is a corporation organized and existing under the laws of Germany with its principal place of business in Frankfurt, Germany and branch locations in New York, New York.  As used herein, the term "Deutsche Bank" includes Defendant Deutsche Bank AG and its subsidiaries and affiliates that entered into foreign exchange transactions with the Class.  During the Class Period, Deutsche Bank directly entered into spot and forward foreign exchange transactions with Class members.

24.     Deutsche Bank confirmed on September 30, 2013, in its third quarterly Interim Report that it "has received requests for information from certain regulatory authorities who are investigating trading in the foreign exchange market" and it is "cooperating with those investigations."[3]  Deutsche Bank's co-chief executive Anshu Jain indicated the bank has set aside for potential litigation relating to foreign exchange manipulation a substantial sum of money that contributed to the 93 percent reduction of the bank's profit in the third quarter. Deutsche Bank has fired three foreign exchange traders in its New York office, including Diego Moraiz, who headed the emerging markets foreign exchange trading desk, Christopher Fahy, and Robert Wallden.  Deutsche Bank also fired Ezequiel Starobinsky, a trader based in Buenos Aires, Argentina.  Deutsche Bank hired a consulting firm to examine chatroom communications and e-mails believed to reference manipulation of foreign exchange rates.  The Bank has since banned the use of multi-bank chatrooms.

25.     Defendant HSBC Bank plc ("HSBC Bank") is a company organized and existing under the laws of the United Kingdom with its principal place of business in London, England. Defendant HSBC Bank USA, N.A. ("HSBC Bank USA") is an indirect, wholly owned subsidiary of Defendant HSBC Holdings Plc and is a federally chartered national banking

---

[3]   Deutsche Bank AG, *Interim Report as of September 30, 2013* (Sept. 30, 2013).

association with its principal place of business in McLean, Virginia, and branch offices in New York, New York. As used herein, the term "HSBC" includes Defendants HSBC Bank and HSBC Bank USA and their subsidiaries and affiliates that entered into foreign exchange transactions with the Class. During the Class Period, HSBC directly entered into spot and forward foreign exchange transactions with Class members.

26.     HSBC confirmed on November 4, 2013, in its third quarterly Interim Management Statement that several governmental agencies are conducting investigations into HSBC "relating to trading on the foreign exchange market" and that HSBC is "cooperating with the investigations."[4] HSBC has suspended multiple foreign exchange traders including Serge Sarramenga, head of its G-10 spot foreign exchange desk, and Edward Pinto.

27.     Defendant J.P. Morgan Chase & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant J.P. Morgan Chase Bank, N.A. is a federally chartered national banking association with its principal place of business in New York, New York. On May 29, 2008, J.P. Morgan Chase & Co. merged with Bear Stearns & Co., assuming its assets and liabilities. Before the acquisition, Bear Stearns & Co. was a foreign exchange dealer and acted as a counterparty in foreign exchange transactions. As used herein, the term "JP Morgan" includes Defendants J.P. Morgan Chase & Co. and J.P. Morgan Chase Bank, N.A. and their subsidiaries and affiliates, including Bear Stearns & Co., that entered into foreign exchange transactions with the Class. During the Class Period, JP Morgan directly entered into spot and forward foreign exchange transactions with Class members.

_____

[4]  HSBC Holdings plc, *Interim Management Statement – 3Q 2013* (Nov. 4, 2013).

28.     JP Morgan confirmed on November 1, 2013, in its third quarterly Form 10-Q Report that it "has received information requests from various government authorities regarding the Firm's foreign exchange trading business" and that it "is cooperating with the relevant authorities."[5]  JP Morgan has suspended Richard Usher, its head of G-10 spot trading.  It has also banned the use of multi-bank chatrooms by foreign exchange traders.

29.     Defendant Royal Bank of Scotland PLC ("RBS plc") is the primary operating bank and subsidiary of the Royal Bank of Scotland Group PLC, a corporation organized and existing under the laws of the United Kingdom with its principal place of business in Edinburgh, Scotland.  RBS plc does business and maintains branch locations in New York, New York.  As used herein, the term "RBS" includes Defendant RBS plc and its subsidiaries and affiliates that entered into foreign exchange transactions with the Class.  During the Class Period, RBS directly entered into spot and forward foreign exchange transactions with Class members.

30.     RBS confirmed on November 1, 2013, in its third quarterly Interim Management Statement that "various governmental and regulatory authorities have commenced investigations into foreign exchange trading activities apparently involving multiple financial institutions, that it "has received enquiries from certain of these authorities," and is "reviewing communications and procedures relating to certain currency exchange benchmark rates as well as foreign exchange trading activity and is cooperating with these investigations."[6]  RBS has suspended foreign exchange traders including Paul Nash and Julian Munson.  On January 29, 2014, RBS notified clients that it plans to stop accepting orders from clients that will be executed on certain currency benchmark rates.

---

[5]   JPMorgan Chase & Co., *Form 10-Q Quarterly Report* (Nov. 1, 2013).

[6]   RBS Group, *Interim Management Statement Q3 2013* (Nov. 1, 2013).

31.     Defendant UBS AG ("UBS AG") is a corporation organized and existing under the laws of Switzerland with its principal places of business in Basel and Zurich, Switzerland and regional offices in New York, New York and Stamford, Connecticut.  As used herein, the term "UBS" includes Defendant UBS AG and its subsidiaries and affiliates that entered into foreign exchange transactions with the Class.  During the Class Period, UBS directly entered into spot and forward foreign exchange transactions with Class members.

32.     UBS confirmed on October 29, 2013, in its Third Quarter 2013 Report that "[f]ollowing an initial media report in June 2013 of widespread irregularities in the foreign exchange markets, [UBS] immediately commenced an internal review of [its] foreign exchange business," that "[s]ince then, various authorities reportedly have commenced investigations concerning possible manipulation of foreign exchange markets," and that UBS has "received requests from various authorities relating to [its] foreign exchange businesses, and UBS is cooperating with the authorities."[7]  UBS has restructured its foreign currency trading unit, and its global head, Chris Vogelgesang, has stepped down.  UBS has dismissed at least two of its traders, Niall O'Riordan and Roger Boehler.  Matt Gardiner, a former UBS currency trader who is now at Standard Chartered, has also been suspended.  UBS has also banned the use of multi-bank chatrooms.

33.     Various other entities and individuals unknown to Plaintiff at this time participated as co-conspirators in the acts complained of, and performed acts and made statements that aided and abetted and were in furtherance of, the unlawful conduct alleged herein.

---

[7]   UBS, *Third Quarter 2013 Report* (Oct. 29, 2013).

## FACTUAL ALLEGATIONS

### A.   Foreign Exchange Market Generally

34.    Foreign exchange is the buying and selling of currency, or the exchanging of one type of currency for another.  The foreign exchange market is the largest in the financial system, with an estimated daily turnover between $4.7 trillion to $5.3 trillion.

35.    Most trades in the foreign exchange market are spot or forwards transactions.  A spot transaction is the exchange of two currencies between counterparties at an agreed-to rate for immediate delivery.  A forward contract, like a spot transaction, also involves the exchange of two currencies between counterparties at an agreed-to rate at the time of the contract, but with delivery at some time in the future.  The majority of the daily turnover in the foreign exchange market – roughly $2 trillion – involves spot transactions.  Roughly three quarters of all spot transactions involve the U.S. dollar.

36.    The market is largely organized as an over-the-counter market, meaning that there is no centralized exchange and that to exchange currency, a customer – such as the Class members – must utilize a foreign exchange dealer, such as one of the Defendants.  Dealers (also called market makers) exist to provide liquidity to the market and to ensure there is always a counterparty for any foreign exchange transaction.

37.    In the over-the-counter market, to initiate a foreign exchange transaction, a customer contacts a dealer indicating the currency and quantity she wishes to trade, and inquires as to the price.  The dealer states prices at which it is willing to buy (the "bid") and sell (the "ask").  The customer then decides whether to buy, sell, or pass.  The dealer is compensated for its services by a favorable gap between the quoted buy and sell prices, the "bid-ask spread." Dealers profit by providing this service to customers.

38.     Historically and to a large extent today, foreign exchange transactions were carried out by telephoning a salesperson or voice broker at a dealer bank, who would receive the trade information, provide a bid and an ask price, and often accept a trade.  Because foreign exchange salespeople have strong institutional relationships and keep track of clients' order histories, they are often able to predict client trading even before an order is placed.  Throughout the order process salespeople are in regular contact with traders.  They inform the traders of incoming potential orders, they confirm bid and ask prices, and they ultimately convey placed orders to the trading desk for processing.  Thus, generally traders are aware of all potential and pending trades that could be processed through their desks.

### B.     <u>WM/Reuters Rates</u>

39.     While a foreign exchange contract may be entered into and executed at any time, investors often use what are called WM/Reuters rates as the price in a spot or forward transaction.

40.     A WM/Reuters rate, calculated largely based on actual trades by a joint venture between State Street Corp. (which owns World Markets Co. or "WM") and Reuters, provides a standardized rate that allows investors to price, settle, and value financial instruments such as spot and forwards transactions.  A WM/Reuters rate is used by investors such as Plaintiff here to avoid reconciliation differences that might result from making changes to a portfolio benchmarked against an index.  In other words, investors such as the Class often decide to tie a spot or forward transaction to a WM/Reuters rate in order to avoid poor or untimely execution of currency trades.

41.     Defendants play no part in the calculation of WM/Reuters rates.  Rather, unlike some other financial benchmarks, WM/Reuters rates are merely median prices of all trades in a fixed period for currency pairs, determined on a half-hourly, hourly, or end-of-day basis.

42.     A WM/Reuters rate is calculated using data from bids and offers and actual foreign exchange trades executed over a one-minute period (or two minutes for some currencies), lasting 30 seconds before to 30 seconds after the time of the rate calculation.  According to State Street Corp.: "The process for capturing this information and calculating the spot fixings is automated and anonymous."[8]  Using that data, a median bid and offer rate are calculated, and then a mid rate is calculated from these median bid and offer rates – that rate is the WM/Reuters rate for that hour.  The median methodology employed by WM/Reuters takes no account of the size of the notional behind each quote, weighting all quotes equally.

43.     The most widely used WM/Reuters rate is the WM/Reuters closing spot rate (defined above as the "WM/Reuters Closing Rate"), which is calculated at 4 p.m. in London. There is a WM/Reuters Closing Rate for every currency pair traded.  Trading volume at the WM/Reuters Closing Rate is especially high at the end of the month because many funds use that rate to rebalance their portfolios.

### C.     Market Changes Caused Increased Concentration Among Dealers

44.     Beginning in the late 1990s, the foreign exchange market has seen changes that tightened bid-ask spreads and increased concentration as well as market power among the dealers, including Defendants.

45.     In the late 1990s and continuing to the early 2000s, electronic trading platforms emerged as a way to process foreign exchange transactions.  In response to their customers' demands for increased electronic trading, dealers – including a majority of the Defendants – launched proprietary electronic trading platforms in the early 2000s, including UBS's FX Trader, Barclays' BARX, Deutsche Bank's Autobahn, and Citi's Velocity.

---

[8]  Liam Vaughan, Gavin Finch & Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, Bloomberg (Jun. 12, 2013).

46.     The effect of these trading platforms was to narrow bid-ask spreads by lowering dealers' operating costs and reducing execution times.  While in the 1980s the bid-ask spreads in the over-the-counter market were roughly 20 times those in the inter-dealer market, they have since compressed and are roughly equal.  These bid-ask spreads have only reduced further since the financial crisis.

47.     As the *Financial Times* reported, based on interviews with traders, given that spreads are "the only source of client-driven income for banks in forex trades," this reduction in spreads "may have encouraged traders to seek less transparent ways to cut their risks."[9]

48.     The introduction of electronic trading also resulted in increase market concentration among foreign exchange dealers.  Because dealers have been forced to invest heavily in electronic trading technology while at the same time quoting tighter bid-ask spreads, smaller dealers have largely exited the market.  This increased concentration facilitated the collusion at issue in this complaint.

49.     Thus, between 1998 and 2010, the market share of the top three dealers – all Defendants – has risen from 19% to 40%.  The increasing concentration of the foreign exchange market is summarized below.

---

[9]   Daniel Schafer, Alice Ross & Delphine Strauss, *Foreign Exchange: The Big Fix*, Financial Times (Nov. 12, 2013).



50.     In recent years, Defendants have maintained an aggregate market share of nearly

70 percent, according to a survey by *Euromoney*, an industry publication.  Defendants' shares of

the foreign exchange market in the previous two years are summarized below.

| 2012 and 2013 Rank | Bank | 2012 Market Share | 2013 Market Share |
|---|---|---|---|
| 1 | Deutsche Bank | 14.57% | 15.18% |
| 2 | Citigroup | 12.26% | 14.90% |
| 3 | Barclays | 10.95% | 10.24% |
| 4 | UBS | 10.48% | 10.11% |
| 5 | HSBC | 6.72% | 6.93% |
| 6 | JP Morgan | 6.60% | 6.07% |
| 7 | RBS | 5.86% | 5.62% |
| **Defendants' Aggregate Market Share:** | | **67.44%** | **69.05%** |

51.     As the market has become more concentrated, the community of foreign exchange

traders at dealer banks has also shrunk.  These traders receive bonuses tied to their individual

profits and the profits of the entire trading floor.  Since the financial crisis, there have been staff

reductions and the spot foreign exchange trading desks, even at the largest banks such as

- 16 -

Defendants', are typically staffed with only eight to ten traders, many of whom have worked previously with their counterparts in other banks. Thus the market is dominated by a small group of individuals, often with strong social ties formed by working with each other at some point in the past. In fact, many of these traders live near each other, socialize together, belong to the same social clubs, and participate on the same professional committees.

52.     The *Financial Times* reports that interviews with more than a dozen foreign exchange veterans and investors suggest these changes in the structure of the Defendants' businesses and the small, close-knit exchange trader community have increased incentives and opportunism for collusion.[10] As one former Citi banker noted, "This is a market in which price fixing and collusion could actually work."[11]

**D.      Defendants' Dominance Positioned Them To Capitalize On Their Customers' Transactions.**

53.     The vast majority of the foreign exchange market is unregulated. Because of numerous regulatory exemptions, even dealer reporting requirements are minimal. Prior to the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), which became effective in July 2011, foreign exchange transactions were virtually unregulated. Even after the Act's became effective, spot and forwards transactions have been exempt from regulation under the Commodity Exchange Act as a result of a rule promulgated by the Treasury Department. This absence of regulation and reporting requirements, coupled with high market concentration, has resulted in a highly opaque market.

54.     Defendants enjoy informational advantages as a result of this market opacity. Knowledge of a customers' identity, trading patterns, and orders allows a dealer to predict the

---

[10]     Schafer et al., *supra* note 9.

[11]     *Id.*

direction of market movements.  Aggregated together, knowledge of customer order flow is highly informative of future exchange rate movement and carries substantial economic value for the dealers observing these flows.

55.     Thus the greater a dealers' size, generally the more it knows of the likely movement of exchange rates.  Defendants, as the largest dealers, have the most information about likely market movements.

**E.     <u>Defendants Sought to Profit Off of Customer Transactions</u>.**

56.     Information about likely future exchange rate movements allows traders at the Defendant banks to take advantage of their customer orders in order to profit off the resulting exchange rate movement.

57.     As three traders told *Bloomberg*, "when they received a large order they would adjust their own positions knowing that their client's trade could move the market. If they didn't do so, they said, they risked losing money for their banks."[12]  One trader explained this process to *Bloomberg* in detail:

> if he received an order at 3:30 p.m. to sell 1 billion euros ($1.3 billion) in exchange for Swiss francs at the 4 p.m. fix, he would have two objectives: to sell his own euros at the highest price and also to move the rate lower so that at 4 p.m. he could buy the currency from his client at a lower price.  He would profit from the difference between the reference rate and the higher price at which he sold his own euros, he said.  A move in the benchmark of 2 basis points, or 0.02 percent, would be worth 200,000 francs ($216,000).[13]

58.     This practice, in which a dealer trades his own position in advance of his customer's in order to take advantage of the market movement resulting from a large customer order, is known as "front running."  Front running is an illegal practice under U.S., European Union, and United Kingdom law, and is regarded as unethical by trade associations.

---

[12]   Vaughan et al., *supra* note 8.

[13]   *Id.*

59.     Because of the size and trading volume of the foreign exchange market, particularly around the time of the calculation of the 4 p.m. closing rate, front running based only on a single Defendant's customer's trading information would be a highly risky strategy that could easily backfire, since the market could move in a direction opposite of that taken by a dealer.  As a trader noted, front running "could still backfire if another dealer with a larger position bets in the other direction or if market-moving news breaks during the 60-second window."[14]  Thus, according to a former dealer interviewed by *Bloomberg*, front running is "a risky strategy that he only attempted when he had a high degree of knowledge of *other banks' positions* and a particularly large client order."[15]  In short, while a dealer can turn a profit on front running a client's order, it is a risky strategy when attempted alone.

**F.      Defendants Colluded Using Chatrooms and Instant Messaging to Manipulate Foreign Exchange Closing Rates.**

60.     To remove the uncertainties and risk associated with front running – *i.e.*, that the market will move against a Defendant's position – and to reap greater profits in the foreign exchange market, Defendants regularly conspired with each other over the course of a decade to manipulate the WM/Reuters Closing Rate for multiple currency pairs.

61.     Top traders at each of the Defendant banks regularly conspired to and did manipulate the WM/Reuters closing rate through a series of manipulative trading strategies executed in concert.  These traders colluded on a daily basis, often throughout the day, about their customers' orders and jointly agreed to work together to rig the WM/Reuters closing rate for currency pairs to their mutual advantage.  Much of this collusion was orchestrated through Bloomberg chatrooms, instant messages, and text messaging among Defendants' traders.

---

[14]   *Id.*

[15]   *Id.*

62.     This conspiracy took place at the highest levels of Defendants' foreign exchange divisions.  Senior traders employed by each of the Defendants regularly used a Bloomberg chatroom, alternatively known as "The Cartel" and "The Mafia," to orchestrate trading strategies designed to manipulate WM/Reuters closing rates.

63.     While the membership of "The Cartel" changed somewhat over time, its principal participants were high ranking employees from each of the Defendants named here, including:

      a.     Richard Usher, who, before being placed on leave, was head of spot trading for G-10 currencies at JP Morgan in London, and before that was a trader at RBS;

      b.     Rohan Ramchandani, who, before being suspended and then fired, was head of spot trading at Citi in London;

      c.     Matt Gardiner, who was suspended by Standard Chartered for his conduct as director of spot trading for EUR/USD at Barclays from 2007 to 2011 and as a trader at UBS from 2011 to 2013; and

      d.     Niall O'Riordan, who, until being suspended, was co-global head of G-10 and emerging market spot trading at UBS in Zurich.

64.     Numerous other traders employed by the Defendants have been part of "The Cartel."  Throughout the existence of "The Cartel," Richard Usher was its leader and moderator – he operated it in his position at RBS until he left in 2010, and then revived it when he joined JP Morgan the same year.

65.     Defendants operated other private chatrooms in addition to "The Cartel."  Some of Defendants' traders were members of as many as fifty chatrooms when the 4 p.m. closing was taking place.  These chatrooms were called, among other things, "The Club," "The Bandits'

Club," "The Dream Team," "One Team, One Dream," and "The Sterling Lads." The members of other chatrooms included:

    a.   Chris Ashton, head of spot trading at Barclays, and Jack Murray, Mark Clark, Russell Katz, and Jerry Urwin, also of Barclays;

    b.   Andrew Amantia and Anthony John of Citi;

    c.   Diego Moraiz, head of emerging markets trading, and Robert Wallden, Christopher Fahy, and Ezequiel Starobinsky, also of Deutsche Bank;

    d.   Serge Sarramenga, chief trader for G-10 currencies, and Edward Pinto at HSBC;

    e.   Paul Nash and Julian Munson at RBS; and

    f.   Roger Boehler, global head of trading at UBS.

66.    Defendants formed these chatrooms with the specific intent to collude with each other to manipulate particular currency pairs. For instance, a senior Deutsche Bank trader was a member of a chatroom used to jointly manipulate the exchange rate between U.S. dollars and Argentinean pesos. Similarly, "The Sterling Lads," which included traders specializing in sterling, such as Anthony John of Citi, was a chatroom typically devoted to agreements to manipulate the exchange rate between the U.S. dollar and the pound sterling.

67.    While the participants in these chatrooms varied over time, the conspiracies orchestrated through these chatrooms to manipulate the WM/Reuters Closing Rates continued for over a decade.

68.    The collusion among Defendants' employees was facilitated in part because many of these traders worked together previously and formed social ties. For example, Chris Ashton of Barclays was co-head of spot trading with Matt Gardiner until Gardiner left Barclays for Citi,

at which time Ashton and Gardiner began sharing their customers' confidential information and colluding to manipulate the WM/Reuters Closing Rates.

69.     Similarly, Richard Usher, Rohan Ramchandani, and Niall O'Riordan are all members of the chief dealers' subgroup formed under the umbrella of the Bank of England's London Foreign Exchange Joint Standing Committee.  In that role, Usher, Ramchandani and O'Riordan regularly discussed and agreed to manipulate the WM/Reuters Closing Rate, despite the fact that such discussions have no legitimate relationship to the Bank of England's activities. "Records of a meeting in April 2012 . . . show dealers discussed the rules they were subject to when trading close to the times when key market benchmarks, such as the WM/Reuters rates, are set."[16]  According to two people with knowledge of the meeting, these traders "talked about how they shared information about orders to reduce the risk of losses in the minutes before benchmarks are calculated."[17]

70.     Many of Defendants' traders have ongoing social relationships, which were used to facilitate their collusive scheme.  Many of the colluding traders based in London live near each other, attend the same dinner parties, and are members of the same local golf clubs.  These traders also socialize in the chatrooms they use to manipulate the foreign exchange rates, and transcripts that have been reviewed as part of the global investigation are "peppered with allusions to drinks, drugs and women."[18]  The seamless transition between social jokes and gossip and agreements to manipulate foreign exchange rates facilitated the collusive agreements and practices in which these traders engaged.

---

[16]     Gavin Finch, Suzi Ring & Liam Vaughan, *Currency Dealers Told Bank of England of Fix Trading in 2012*, Bloomberg (Jan. 16, 2014).

[17]     *Id.*

[18]     Schafer et al., *supra* note 9.

### G.  Defendants Agreed to Share Confidential Information, Jointly Execute Trading Strategies, and Manipulate the Closing Rates.

71.     Through the use of these chatrooms, Defendants agreed to share confidential customer order information, jointly execute trading strategies, and manipulate the WM/Reuters Closing Rate.

72.     First, Defendants' traders agreed to use the aforementioned chatrooms to get a view about overall order flows across the foreign exchange market and to use this information to build up positions just ahead of and during the WM/Reuters Closing Rate calculation.

73.     Defendants' traders agreed they would accumulate all of each of their institutions' "buy" orders in a specific currency so that they were responsible for all of the planned trades, and then would share their overall positions with their competitors at other Defendant banks. The traders would rely on voice brokers and salespeople within the Defendant banks to aggregate client orders and indicate to the traders what the overall likely positions were.  Traders would then, in turn, share this information with traders at competing banks.

74.     The use of chatrooms for information sharing among competitors about customers' confidential orders has been confirmed by review of chatroom transcripts by regulators and by anonymous sources that have spoken to the press.

75.     Evidence obtained by government regulators shows, for example, that "[s]hortly before the fix . . . it was common for a group of senior currency traders to discuss with their competitors the types and volume of trades they planned to place."[19]  Several banks have already produced evidence confirming as much, admitting, for example, that in some electronic

---

[19]   Katie Martin & David Enrich, *Forex Probe Uncovers Collusion Attempts*, Wall St. J. (Dec. 19, 2013).

messages, traders "inappropriately share market-sensitive information with rivals."[20]  In one transcript that was provided to the U.K. Financial Conduct Authority by RBS, for example, Richard Usher wrote "messages to traders at other firms [that] included details of his trading positions."[21]

76.    Sources interviewed by *Bloomberg* have admitted that Defendants' traders "would share details of orders with brokers and counterparts at banks through instant messages to align their strategies" and they "also would seek to glean information about impending trades to improve their chances of getting the desired move in the benchmark."[22]  Traders employed by the Defendants interviewed by the *Wall Street Journal* and *Financial Times* have also confirmed that traders would communicate through "an electronic chat room populated by top traders at financial institutions"[23] and "chatroom discussions between rival traders . . . allowed them to share information about pricing and order books."[24]

77.    Once Defendants had shared the confidential information of their customers in order to and had an understanding of the overall order flows across the market, they agreed to and did "align their strategies" for trading through these chatrooms.[25]  Evidence uncovered in the global foreign exchange probe shows, for example, that Defendants' traders were "improperly

---

[20]    Chiara Albanese, Katie Martin & David Enrich, *Barclays, Other Banks Expand Foreign-Exchange Review to Salespeople*, Wall Street Journal (Nov. 19, 2013).

[21]    Gavin Finch, Liam Vaughan & Suzi Ring, *Ex-RBS Trader in U.K. Probe Said to Be JPMorgan's Usher*, Bloomberg (Oct. 14, 2013).

[22]    Vaughan et al., *supra* note 8.

[23]    Katie Martin, *Forex Probe Eyes Chat Room*, Wall St. J. (Oct. 11, 2013).

[24]    Schafer et al., *supra* note 9.

[25]    Vaughan et al., *supra* note 8.

working as a pack" and that they "agreed to a sequence for placing their own trades to their advantage."[26]

78.     These sequencing strategies included agreements about the direction in which Defendants wanted to manipulate a currency pair, when to begin the manipulation, and not trading currency in a direction opposite that of the intended manipulation.  Defendants coordinated their trading activities to make sure they were not executing off-setting transactions during that 60-second calculation period.

79.     Thus, for example, if Defendants jointly intended to manipulate the EUR/USD exchange rate by selling Euros in order to suppress the price, they would collectively agree not buy Euros during that period so as to ensure the manipulation would be most effective.  There is absolutely nothing procompetitive about such collusion; rather, like the other conduct alleged herein, it is a naked restriction of competition that violates the antitrust laws *per se*.

80.     Once Defendants' traders agreed jointly to manipulate a concurrency pair in a particular direction, they acted in concert to execute a series of manipulative trading strategies such as front running, "banging the close," and "painting the screen."

81.     *First*, Defendants' traders agreed to and did execute a series of currency exchanges prior to the 4 p.m. rate calculation to drive up the price of the currency customers were interested in buying.  By agreeing to "front run" their customers' transactions, Defendants increased the prices that customers had to pay for their exchanges, and also put Defendants in a position to buy customers' currency at the time of closing at a more favorable price.

82.     *Second*, Defendants' traders also undertook a "banging the close" strategy to further manipulate WM/Reuters Closing Rates, as admitted by four dealers interviewed by

---

[26]   Martin & Enrich, *supra* note 19.

*Bloomberg*.[27]  "Banging the close" – a term used by the traders in chatrooms – involves making a high number of trades in a coordinated fashion within the one-minute window that is used to calculate the WM/Reuters Closing Rates.

83.     As three dealers admitted to *Bloomberg*:  "To maximize profits, dealers would buy or sell client orders in installments during the 60-second window to exert the most pressure possible on the published rates."[28]

84.     Defendants also agreed to break up large customer orders into a series of smaller orders in order to magnify the effect of this "banging the close" strategy.  As one dealer explained:  "Because the benchmark is based on the median of transactions during the period, placing a number of smaller trades could have a greater impact than one big deal."[29]

85.     This is illustrated by the following two diagrams.  In the first, by breaking large orders up, Defendants could artificially create trade volume, which affects what the median price is.  By creating more trades at the very highest or lowest price (depending on the direction of the manipulation), the closing rate is likely to go higher or lower (again, depending on the case):

---

[27]  Vaughan et al., *supra* note 8.

[28]  *Id.*

[29]  *Id.*



86.     Using the same example, had Defendants not broken up orders, there would be less volume and thus the median price at the time of the closing rate calculation would not be as low (or high, depending on the direction):



87.     *Third*, Defendants also conspired to increase the impact of this manipulation by "painting the screen" – a practice of placing orders with other dealers to create the illusion of

trading activity in a given direction in order to move the rates prior to rate calculation. Defendants agreed to execute numerous transactions around the time of the closing rate calculation, only to reverse or unwind these positions after the calculation.

88.     Through this collusive trading in the interdealer market, Defendants were able to position themselves to buy their own customers' holdings at a lower price than they could have done if they operated independently.  Defendants would regularly agree to sell their own holdings in the interdealer market at a high price just before the rate calculation window and then repurchase those holdings at a much lower price while manipulation is occurring and customers' sell orders are being executed.

89.     Thus, by agreeing through chatrooms and instant messages to coordinate the execution of customer orders, "bang the close," "paint the screen" and execute advance deals within the interdealer market, Defendants artificially inflated and suppressed currencies so as to affect the WM/Reuters Closing rates and profit off their customers' transactions.  Defendants engaged in these agreements throughout the Class Period with the purpose and effect of manipulating the WM/Reuters rates to the detriment of Plaintiff and the Class.

**H.     Economic Analyses Confirm Defendants' Manipulation of the WM/Reuters Closing Rates.**

90.     Defendants' manipulation of the WM/Reuters Closing Rates is further confirmed by preliminary studies conducted by Plaintiff's economists and *Bloomberg*.

91.     In conducting these studies, Plaintiff's counsels' economists have used conservative assumptions and have utilized a number of screens, including regressions, and a statistical significance test, to strip out price movement that might otherwise be attributed to non-manipulative market behavior.

92.     Plaintiff's economists examined trading data for six major currency pairs over a six year period and identified anomalous market movements around the 4 p.m. closing. Specifically, Plaintiff's economists utilized three time windows and a combination of three complementary tests to identify dates on which manipulation likely occurred.  First, these economists performed a statistical regression analysis and compared the size of the market move at the closing to a standard predicated size of an expected market move.  Where a market move at the closing was found to significantly exceed the predicted standard size move, that was evidence of anomalous behavior suggesting manipulation.  Second, the economists tested for market price reversals following the closing.  Where a pre-closing move reversed within a short period of time, that suggests market manipulation and not the normal movement of the market.  Third, the economists also ranked the market move preceding the closing, and only considered pre-closing moves that ranked among the top market moves of the day as potentially anomalous.

93.     Based on that analysis, Plaintiff's economist found anomalous price movement on thousands of days within the Class Period (with some days having multiple currencies manipulated).  This study and a study by *Bloomberg* of 14 currency pairs over a two year period confirm that both Plaintiff and the Class were injured on numerous occasions by Defendants' agreement to manipulate the WM/Reuters closing rate.

94.     For instance, within the Class Period, the EUR/USD WM/Reuters Closing Rate was manipulated, with a likely average quantum of manipulation between 0.12 and 0.16 percent. Plaintiff and the Class traded at the 4 p.m. EUR/USD WM/Reuters Closing Rate on numerous occasions and were injured.

95.     For example, on December 3, 2008, Plaintiff exchanged $100,000 for Euros with Defendant HSBC and was injured by Defendants' acts, taken in concert, to manipulate the WM/Reuters Closing Rate to cause the value of the Euro, relative to the dollar, to increase:



96.     Similarly, like much of the Class, Plaintiff also exchanged U.S. dollars for Australian dollars on numerous occasions.  Based on Plaintiff's economist's findings, within the Class Period, the AUD/USD WM/Reuters Closing Rate was manipulated, with a likely average quantum of manipulation between 0.20 and 0.28 percent.

97.     For example, on February 13, 2009, Plaintiff exchanged $70,000 for Australian dollars with Defendant RBS at the WM/Reuters Closing Rate.  As a result of Defendants' collusive acts to manipulate the WM/Reuters Closing Rate on that day, Plaintiff and Class members paid more for the dollars they were purchasing:



98.     Again, similarly, many Class members including Plaintiff exchanged Japanese yen for dollars and vice versa.  Plaintiff's economist has found that, within the Class Period, the USD/JPY WM/Reuters Closing Rate was manipulated, with a likely average quantum of manipulation between 0.15 and 0.19 percent.

99.     Plaintiff and the Class members traded yen for dollars on numerous occasions, including on February 17, 2009, when Plaintiff exchanged yen for $100,000 with Defendant Citi. Using this trade and other trades of the Class members, Defendants manipulated the WM/Reuters Closing Rate so as to drive up the value of the yen vis-à-vis the dollar:



100.    On each of the above example days there was a dramatic increase in a currency price at or around the WM/Reuters 4 p.m. closing for the given currency followed by a quick reversal to pre-manipulation levels.  These patterns in currency prices – where there is a sudden surge followed by a reversal – are consistent with price behavior in other markets in which there has been collusion.

101.    Plaintiff's economist also analyzed the extent to which the price movement at the WM/Reuters closing was anomalous using two different tests.  First, the "Return Forecast Errors" test calculates the difference between the standard or average percentage price change and the actual percentage price change over the last minute period.  The larger the deviation is from the average price change, the more likely the price movement is anomalous.  Second, the "Linear Forecast Errors" test calculates the difference between the current price and an average of prices over the preceding 30 prices recorded in one minute intervals.  Again, a large deviation from the average price is indicative of anomalous price movement attributable to collusion.

102.    Analyzing the price movement around the 4 p.m. closing, Plaintiff's economist observed highly anomalous price behavior on numerous days.  For example, the movement of

the GBP-USD rate around the 4 p.m. closing on December 31, 2008, and October 31, 2008, shown below, is highly indicative of anomalous price movement only explainable by collusive trading.





103.   In addition, both Plaintiff's economist and *Bloomberg* have examined the amount of manipulation of the WM/Reuters Closing Rates following the announcement of government investigations into potential collusion in late June 2013.  Both Plaintiff's economist and *Bloomberg* have found that anomalous price movement around the closing has become rarer and less pronounced in the past six months since investigations began.  The following chart indicates the sizeable decrease in anomalous price movement since July 2013:



104.   Similarly, *Bloomberg* found that from "July through the end of December, qualifying jumps on the last working day of the month occurred only 10 percent of the time.  For several currency pairs, including U.S. dollar to Japanese yen and U.S. dollar to Canadian dollar,

spikes have disappeared altogether.  In dollar-euro, the most widely traded pair, the frequency has fallen to 17 percent from 50 percent on the same six days in 2012."[30]

105.    The sizeable reduction in the number of anomalous days is direct evidence of Defendants' manipulation of the WM/Reuters rate.  As confirmed in other litigations, a statistically significant decrease in anomalous price movement following the initiation of an investigation is proof of that collusive manipulation.

106.    In sum, these analyses show that the price changes around the WM/Reuters closing rate calculation were highly anomalous, unexplained by market activity, and statistically significant.  This is consistent with price artificiality caused by collusive manipulation of the exchange rates around the closing.

## EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS DUE TO DEFENDANTS' CONCEALMENT OF THE CONSPIRACY

107.    During the Class Period, Defendants actively, fraudulently, and effectively concealed their collusion, as alleged herein, from Plaintiff and the Class.

108.    Due to Defendants' efforts to conceal their collusive conduct, and their campaign to avoid its detection, Plaintiff could not, through the exercise of reasonable diligence, have learned of facts indicating that Defendants were colluding to prevent the entry of exchanges into the market until June 12, 2013, when *Bloomberg* first reported of the possibility that Defendants were rigging currency rates.  As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff and the Class's claims have been tolled.

109.    Defendants' conspiracy was by its nature secretive and self-concealing. Defendants used non-public methods of communication, such as private chatrooms and text

---

[30]   Liam Vaughan & Gavin Finch, *London Afternoon Currency Spikes Subside as Regulators Probe*, Bloomberg (Jan. 27, 2014).

messages, to conceal their agreements to manipulate WM/Reuters Closing Rates.  Moreover, Defendants actively and jointly undertook trading strategies designed to conceal their collusive conduct, such as "painting the screen" or executing phony transactions, so that even diligent investors could not detect Defendants' manipulation of exchange rates.

110.    Further, Defendants used false pretenses to collude, executing agreements to rig the WM/Reuters Closing Rates while operating under the guise of legitimate corporate communications.  For instance, as alleged above, Defendants were members of the Bank of England's London Foreign Exchange Joint Standing Committee, and using the cover of their membership, as part of the chief dealers' subgroup, Defendants met and reached agreements to manipulate the WM/Reuters Closing Rates.  These meetings concerned trading strategies that were in no way connected to legitimate work of the subgroup.  When concerns were privately raised at a Bank of England meeting over possible manipulation for WM/Reuters Closing Rates, according to chatroom transcripts reviewed by people that spoke with *Bloomberg*, the Defendants acted jointly and through chatrooms to disguise their conduct.

111.    To Plaintiff's knowledge, the first significant disclosure of the fact that the Defendants conspired to manipulate the WM/Reuters Closing Rate was the June 12, 2013 *Bloomberg* article.  While regulators such as the United Kingdom Financial Conduct Authority, the U.S. Department of Justice criminal and antitrust divisions, the U.S. Commodity Futures Trading Commission, the U.S. Federal Reserve, the New York Attorney General's Office, the Office of the Comptroller of the Currency, the Swiss Financial Market Supervisory Authority, the Swiss competition authority WEKO, the Hong Kong Monetary Authority, the Monetary Authority of Singapore, and the Dutch regulator AFM have all opened investigations, all of these investigations commenced after the publication of the *Bloomberg* article in June.

112.     Even when *Bloomberg* first exposed collusion among the Defendants using chatrooms and instant messaging services, Defendants did not break ranks, but instead engaged in ongoing efforts to keep their collusion hidden.  In response to inquiries from the reporter, the banks refused to comment and offered phony justifications for their communications.

113.     The first antitrust action on behalf of a class of person engaged in foreign exchange transactions was filed on November 1, 2013.  This had the effect of tolling the limitations period for antitrust claims by those investors – *i.e.*, the Class alleged in this complaint.

114.     Throughout the Class Period, Plaintiff regularly monitored their investments and conducted due diligence to try to avoid being harmed by financial misconduct.  Practically speaking, there were limits to what could be done, given that so much of the foreign exchange market was shrouded in secrecy due to Defendants' conduct.

115.     Further, reasonable due diligence could not have uncovered Defendants' conspiracy because (1) Defendants' trades and trading strategies are not public information; and (2) the bilateral, non-exchange traded nature of the trades at issue further obscures what Defendants were, and are, doing at any particular time.

116.     As a result of the self-concealing nature of the price-fixing conspiracy, the active steps taken by Defendants to fraudulently conceal their conspiracy and the lack of public information concerning material aspects of the conspiracy, the statute of limitations was tolled for Plaintiff's claim.

## CLASS ACTION ALLEGATIONS

117.     Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Class"):

All persons or entities who, beginning as early as January 1, 2003
and continuing to the present, entered into foreign exchange
transactions that were settled at or around the fixing of
WM/Reuters rates.

Excluded from the Class are Defendants and their employees,
affiliates, parents, subsidiaries, and co-conspirators, whether or not
named in this Complaint, and the United States government.

118.    Plaintiff believes that there are at least hundreds, if not thousands, of members of
the Class as described above, the exact number and their identities being known by Defendants,
making the Class so numerous and geographically dispersed that joinder of all members is
impracticable.

119.    There are questions of law and fact common to the Class that relate to the
existence of the conspiracy alleged, and the type and common pattern of injury sustained as a
result thereof, including, but not limited to:

a.   Whether Defendants and their co-conspirators engaged in a combination or
conspiracy to fix, raise, maintain, stabilize and/or otherwise manipulate the
WM/Reuters Rates for various currency pairs in the United States in violation of
the Sherman Act;

b.   The identity of the participants in the conspiracy;

c.   The duration of the conspiracy;

d.   The nature and character of the acts performed by Defendants and their co-
conspirators in furtherance of the conspiracy;

e.   Whether the conduct of Defendants and their co-conspirators, as alleged in this
Complaint, caused injury to the business and property of Plaintiff and other
members of the Class;

    f.   Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiff and the members of the Classes;

    g.   The appropriate injunctive and equitable relief for the Class; and

    h.   The appropriate measure of damages sustained by Plaintiff and other members of the Class.

120.    Plaintiff engaged in foreign exchange transactions at rates that were manipulated by Defendants, and its interests are coincident with and not antagonistic to those of the other members of the Class. Plaintiff is a member of Class; has claims that are typical of the claims of the Class members; and will fairly and adequately protect the interests of the members of the Class. In addition, Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

121.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

122.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

123.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that number individual actions would engender. The Class is readily definable and is one for which records should exist in the files of Defendants and their co-conspirators, and prosecution as a class action will eliminate the possibility of repetitious litigation. Class treatment will also permit the adjudication of relatively

small claims by many members of the Class who otherwise could not afford to litigate an antitrust claim such as the ones asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### (Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act)

124.    Plaintiff hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

125.    Defendants and their unnamed coconspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

126.    During the Class Period, Defendants entered into a series of agreements to reduce competition amongst themselves by coordinating trading strategies for the purpose of manipulating the WM/Reuters Rates for various currency pairs.

127.    This conspiracy to manipulate WM/Reuters rates caused injury to both Plaintiff and the Class because they were deprived of the benefit of accurate WM/Reuters rates reflecting actual market conditions, as well as accurate spot foreign exchange rates for some period during and following Defendants' unlawful conduct, and thus received, upon execution of their trades, less in value than they would have received absent Defendants' wrongful conduct.

128.    The conspiracy is a *per se* violation of Section 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the foreign exchange market.  There is no legitimate business justification for, or pro-competitive benefits caused by, Defendants' conduct.

129.    As a direct and proximate result of Defendants' violation of Section 1 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property throughout the Class Period.

130.    Plaintiff and members of the Class are entitled to treble damages for the violations of the Sherman Act alleged herein.  Plaintiff and members of the Class are also entitled to an injunction against Defendants, preventing and restraining the violations alleged above.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment)

131.    Plaintiff hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

132.    Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiff and members of the Class.

133.    Plaintiff and members of the Class seek restoration of the monies of which they were unfairly and improperly deprived, as described herein.

## PRAYER FOR RELIEF

Plaintiff demands relief as follows:

A.    That the Court certify this lawsuit as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as a class representative, and that Plaintiff's counsel be appointed as Class counsel for the Class;

B.    That the unlawful conduct alleged herein be adjudged and decreed to violate Section 1 of the Sherman Act;

C.    That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

D.     That the Court award Plaintiff and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest;

E.     That the Court award Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

F.     That the Court direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

trial as to all issues triable by a jury.

DATED: February 11, 2014

<div style="margin-left: 40%">

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


STEIG D. OLSON
DANIEL L. BROCKETT
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
Fax: (212) 849-7100
danbrockett@quinnemanuel.com
steigolson@quinnemanuel.com

OBERMAYER REBMANN MAXWELL &
HIPPEL LLP
WILLIAM J. LEONARD
(*Pro hac vice application forthcoming*)
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103-1895
Telephone: (215) 655-3000
Fax: (215) 665-3165
william.leonard@obermayer.com

BONI & ZACK LLC
MICHAEL J. BONI
JOSHUA D. SNYDER
(*Pro hac vice applications forthcoming*)
15 St. Asaphs Road
Bala Cynwyd, Pennsylvania 19004
Telephone: (610) 822-0200
Fax:  (610) 822-0206
mboni@bonizack.com
jsnyder@bonizack.com

*Counsel for Plaintiff and the Proposed Class*

</div>